IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER  8730, THAT IS STORED AT A PREMISES CONTROLLED BY VERIZON WIRELESS AT 180 WASHINGTON VALLEY RD, BEDMINSTER, NJ** | Case No. 20- mj-80-01-AJ<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Benjamin Slocum, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the U.S. Department of Homeland Security, Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), and have been so employed since June 2007. I am currently assigned to the Manchester, New Hampshire field office. As part of my regular duties as a Special Agent, I investigate criminal violations relating to a broad range of immigration and customs-related statutes and have been cross-designated to investigate violations relating to the distribution of illicit narcotics as specified under Title 21 of the U.S. Code. I have been trained in drug investigations, search warrants, undercover techniques, surveillance, debriefing of informants, and other investigative procedures. Through my training, education, and experience, I have become familiar generally with the manner in which drug distribution organizations conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement. In the course of participating in

1

investigations of drug distribution organizations, I have conducted or participated in surveillance, the purchase of illegal drugs, the execution of search warrants, the use of tracking devices, debriefings of subjects, witnesses, and informants, and reviews of consensually recorded conversations and meetings.

2.  I make this affidavit in support of an application for a search warrant for information associated with cellular telephone ▓▓▓▓8730 ("Target Telephone #1"), IMEI/ESN unknown, subscriber Ryan DEAN, date of birth ▓▓▓▓ of ▓▓▓▓▓▓▓▓▓▓▓▓, Hinsdale, New Hampshire, for the period of March 18, 2020 through March 26, 2020, which is stored at a premises owned, maintained, controlled, or operated by Verizon Wireless ("Verizon Wireless"), a wireless provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey 07921. The information to be searched is described in the following paragraphs and in Attachment A and Attachment B. This affidavit is made pursuant to 18 U.S.C. §§ 2703 (a), 2703(b)(l)(A) and 2703(c)(l)(A), and requires Verizon Wireless to disclose to the United States records and other information in its possession pertaining to the subscriber or customer associated with the account for Target Telephone #1, including the contents of communications.

3.  I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(l)(A) and 2703(c)(l)(A), by using the warrant to require Verizon Wireless to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

4.      Based on my training and experience, and the facts set forth in this affidavit, I have probable cause to believe that the target of the investigation: Ryan DEAN, date of birth ▓▓▓▓▓ of ▓▓▓▓▓▓▓▓▓▓▓▓▓ Hinsdale, New Hampshire, is currently engaged in a conspiracy to distribute and possess with the intent to distribute marijuana, in violation of 21 U.S.C. §§ 841 & 846, and money laundering in violation of 18 U.S.C. § 1956.

5.      I also have probable cause to believe: (a) that DEAN obtains large quantities of marijuana for distribution from unknown sources, some of whom are possibly located in California, New York, and Maine; (b) that DEAN obtains the marijuana for distribution to individuals in the Keene, New Hampshire area and surrounding towns; and (c) that DEAN specifically utilizes Target Telephone #1 in order to facilitate the distribution of marijuana to individuals in Keene, New Hampshire and the surrounding towns.

6.      Accordingly, I believe that there is probable cause to believe that a search of the information associated with Target Telephone #1, which is stored at a premises owned, maintained, controlled, or operated by Verizon Wireless, will lead to evidence, fruits, and instrumentalities of the aforementioned crimes as well as to the identification of co-conspirators who are engaged in the commission of those and related violations of the law.

**PROBABLE CAUSE**

7.      On or about October 10th, 2019, I learned from a Keene Police Department (KPD) reliable confidential informant ("CI") that Ryan DEAN is involved in the distribution of narcotics in violation of 21 USC § 841 in the greater Keene, New Hampshire area. The CI originally began cooperating with the KPD for consideration on pending criminal charges. The CI subsequently informed law enforcement that DEAN regularly receives large shipments of marijuana from California and New York. DEAN generally will only sell marijuana to customers by the pound.

DEAN charges anywhere from $1,800 to $2,200 per pound. On several occasions the CI has seen DEAN in possession of several pounds of marijuana while in DEAN's vehicle.

8.      On or about October 28, 2019, at the direction of law enforcement, the CI contacted DEAN to arrange a small purchase of $200 of marijuana. During this meeting, the CI was joined by a New Hampshire State Police Trooper (UCA) acting in an Under-Cover capacity. The purpose of this meeting was to have the CI introduce the UCA as a potential future buyer from DEAN. The UCA did not have direct contact with DEAN during this meeting, but DEAN witnessed the UCA hand the CI the $200 of buy money for the purchase of the marijuana.

9.      On or about November 12, 2019, at the direction of law enforcement, the CI made contact with DEAN and arranged to make another purchase of $800 of marijuana. The CI was again joined by the UCA. During this meeting, the UCA met with the CI and DEAN in a vehicle owned by DEAN.

10.     Once in the vehicle, DEAN handed the UCA a plastic bag that contained what appeared to be marijuana. The UCA then discussed the price with DEAN and confirmed $800 was acceptable. During the meeting, DEAN supplied the UCA with Target Telephone #1 and stated that the UCA could call him directly if he wanted to make future purchases. DEAN told the UCA that he was buying "Top Tier" quality marijuana.

11.     DEAN and the UCA further discussed where the UCA was purchasing his marijuana from and prices that he was paying. DEAN stated to the UCA that he gets his marijuana from Massachusetts, California, New York, and Maine and guaranteed that he could "under cut" the price of anyone around. DEAN stated that he was able to do this because he buys directly from the growers and people who have warehouses in Maine.

12. DEAN stated further stated that his source of supply in California will fill a storage unit up in the Northeast with marijuana and call him with the location and mail him a key so that he can take whatever amount he wishes. DEAN stated that on some of the larger cash amount deals he will send bulk cash payments back to his source of supply through the mail.

13. The UCA stated that he was making these purchases for his boss, since his boss was looking for a better source of supply. DEAN asked the UCA if his boss wanted to purchase as much as 10-20 "P's" (commonly used drug slang for pound quantity). DEAN stated that he could deliver that much on a regular basis with no problem.

14. DEAN further stated during this meeting that he also makes "Dabs." From my training and experience, I know that "Dabs" or "dabbing" are names for the use of concentrated butane hash oil (or BHO), which is a relatively new method of administering/ingesting cannabis that involves the inhalation of highly concentrated tetrahydrocannabinol (THC), the main active chemical in cannabis. DEAN then showed the UCA a video of his cooking operation in his backyard of him making "Dabs." DEAN indicated that for every pound of marijuana he cooks, he gets 2.5 ounces of "Dab."

15. On November 26, 2019, the UCA made contact with DEAN at Target Telephone #1 to purchase $800 worth of marijuana. During this meeting, DEAN arrived in a 1992 Mitsubishi that is registered to DEAN. The UCA got into the front seat of the vehicle, at which time DEAN handed him 2 vacuum-sealed bags of marijuana. DEAN stated that he brought two different kinds of marijuana and described them as "Girl Scout Cookies" and "Liquorice Haze". The UCA handed DEAN the $800 and DEAN added the money to a larger wad of money that he removed from the inside of his jacket. The UCA stated that he would not be offended if DEAN counted the money.

DEAN's response was that he has "a machine" at home. The UCA believed DEAN was referring to a money counter.

16. On December 11, 2019, the UCA contacted DEAN at Target Telephone #1 and arranged a purchase of $550 worth of "Dab". DEAN arrived at the meeting in a 2006 Hummer that is registered to DEAN. The UCA got into the front seat of the Hummer where subsequently DEAN handed the UCA a plastic bag that contained approximately 28 individual plastic containers that contained marijuana extract (shatter/dabs). The UCA confirmed the price of $550 and then handed DEAN the currency.

17. During this meeting, DEAN again discussed how he manufactured the "Dabs" and "Shatter". DEAN described "Shatter" as basically pure THC (tetrahydracannabinol, the principal psychoactive ingredient in marijuana). DEAN explained that he sells it faster than he can make it. Once he has a batch made, he posts it online and sells out immediately.

18. During this same meeting, DEAN discussed just having to deposit $70,000 into the bank. The UCA asked how he does this without filling out paperwork or making the bank suspicious. DEAN stated that he meets with the bank manager and files some paperwork. DEAN stated that he utilizes two business accounts to "funnel" his money through.

19. DEAN further stated that if the UCA's boss was serious about making larger purchases, he would charge $1,800 per pound. DEAN stated that he has done $150,000 deals with suppliers in Maine. DEAN stated that he does not bring money to larger deals like this. He stated that he will send the money in the mail.

20. On January 7, 2020, the UCA contacted DEAN at Target Telephone #1 and arranged to make a purchase of 1 pound of marijuana from DEAN for $1,000. Once DEAN arrived at the meet location, the UCA got into the front seat of his vehicle where DEAN subsequently

handed the UCA 1 pound of suspected marijuana in a vacuum sealed bag and $300 worth of "Dabs". The UCA then paid DEAN $1,300 for the marijuana and the "Dabs".

21. While in the vehicle, DEAN discussed with the UCA about having to go to Portland, Maine if the UCA wanted to purchase higher quality marijuana. During this conversation, DEAN showed the UCA some photographs on Target Telephone #1 of different kinds of marijuana he had available and their prices. DEAN came across a photograph that depicted what the UCA believed to be bulk currency. DEAN stated that "Those are all ten thousand stacks right there."

22. On January 21, 2020, the UCA contacted DEAN at Target Telephone #1 and arranged to make a purchase of 1 pound of marijuana from DEAN for $1,000. Once at the meeting location, DEAN exited his vehicle carrying a cardboard box and get into the rear passenger seat of the UCA's vehicle that was also occupied by an HSI UCA. While in the UCA's vehicle, DEAN handed the UCA the cardboard box that contained what appeared to be 1 pound of marijuana in a vacuum sealed bag. The UCA handed DEAN the $1,000 of serialized U.S. currency. The HSI UCA discussed with DEAN about wiring money into DEAN's bank account if they wanted to buy larger amounts of marijuana. DEAN stated that would not be a problem, since he has done things like that in the past.

23. During further conversation with DEAN, the HSI UCA offered to wire money for DEAN to his suppliers in California if he wanted. DEAN stated that he prefers to use the postal service. When the HSI UCA stated that it seemed risky to mail large amounts money, DEAN stated that he has been doing this for years and never has lost a package. DEAN explained that he places the currency into a money box, then heat seals the money box closed. Then he places the money inside a postal box and fills the postal box with spray foam. DEAN then showed the HSI

UCA a photograph on Target Telephone #1 of what appeared to metal box with "Money Box" written across the top of it, inside a postal cardboard box. DEAN stated that he will take a picture of the tracking number and supply that to his source of supply and once it hits the mail, he is not responsible for it. At the conclusion of the meeting, DEAN exited the UCA's vehicle and got back into the vehicle and exited the parking lot.

24. On January 28, 2020, the UCA contacted DEAN at Target Telephone #1 and arranged to make a purchase of 1 pound of marijuana from DEAN for $2,000. DEAN and the UCA agreed upon a meet location and time. Prior to the meeting, the UCA sent DEAN a text message to Target Telephone #1 requesting DEAN supply his banking information so that the UCA could wire the $2,000 payment. Via text message from Target Telephone #1, DEAN supplied the UCA with the requested information. A short time later, DEAN arrived in his vehicle at the meet location.

25. The UCA exited their vehicle and got into DEAN's vehicle. Once in DEAN's vehicle, DEAN handed the UCA 1 pound of suspected marijuana concealed in a plastic shopping bag. Once the UCA confirmed the 1 pound of marijuana, the UCA placed a cellular phone call to an HSI UCA confirming the transaction was correct. The HSI UCA then wired the $2,000 into DEAN's bank account. Once DEAN was able to verify on Target Telephone #1 that the funds were received into his account, the UCA exited DEAN's vehicle and both parties exited the area.

26. On February 20, 2020, the UCA contacted DEAN at Target Telephone #1 and made arrangement to purchase 6 pounds of marijuana for $5,000. DEAN stated that he wanted to meet the UCA at the Longhorn Steak House in Keene for lunch. When DEAN arrived at the Longhorn Steak House, he was accompanied by a female that was later identified as his girlfriend,

Melisa AMEZCUA and her minor female child. All the parties sat at a table in the Longhorn Steak House for lunch.

27.     During the lunch, DEAN discussed his marijuana operation openly with the UCA. DEAN explained how he packaged the money he sent to his source of supply. DEAN stated that he would get a flat rate postal box along with some plywood. He would line the inside of the postal box with plywood. He would then place a money box inside the postal box. At that point during this conversation, AMEZCUA stated "Spray Foam". DEAN elaborated that with filling the box with spray foam, a police K9 would not be able to smell the contents of the package.

28.     During the meeting, the UCA went out to DEAN's vehicle and retrieved 6 pounds of marijuana from the inside of DEAN's vehicle. The UCA then called the HSI UCA and confirmed they were in possession of the 6 pounds of marijuana. The HSI UCA then wired the $5,000 into DEAN's bank account. During the lunch, DEAN used Target Telephone #1 to verify the funds were received into his account. After lunch was over, all the parties exited the area.

29.     On March 10, 2020, the UCA contacted DEAN at Target Telephone #1 and made arrangements to purchase 6 pounds of marijuana for $5,000. DEAN stated that he wanted to meet the UCA at the Jersey Mikes submarine shop in Keene, NH for lunch. Upon DEAN's arrival, he met with the UCA in the parking lot and handed the UCA 6 pounds of marijuana in a Town of Hinsdale trash bag.

30.     The UCA then called the HSI UCA and confirmed they were in possession of the 6 pounds of marijuana. The HSI UCA then wired the $5,000 into DEAN's bank account. The UCA and DEAN went into Jersey Mikes for lunch. During the lunch, DEAN was able to verify on Target Telephone #1 that the funds were received into his bank account.

31. During lunch, DEAN discussed this marijuana distribution operation with the UCA. DEAN stated that over the past several days he has sent several payments totaling approximately $250,000 to his sources of supply. DEAN showed the UCA on Target Telephone #1 a photograph of several stacks of United States currency on a counter.

32. DEAN stated that he was going to be heading to Alabama, Mississippi and New York to resupply with marijuana. DEAN further stated that by the time he arrives in New York, he will have to rent a U-Haul trailer to bring all the marijuana back.

33. On March 11, 2020, the UCA received a SMS text message from DEAN at Target Telephone #1 with the image of several stacks of United States Currency on a table and a subsequent SMS text message with an image of a cash box in what appears to be a Priority Mail box.

34. The UCA called DEAN at Target Telephone #1 and asked if that was part of the $250,000 they talked about the prior day. DEAN stated that he was busy packing things up for his trip and this was a new box of cash. DEAN further stated that he did not want to leave any cash laying around his house before he left on his trip.

35. Also, on March 10, 2020, Detective Donald Lundin from the Keene Police Department established surveillance at the United States Post Office in Hinsdale, New Hampshire. During his surveillance, Detective Lundin observed DEAN arrive at the postal facility and enter the facility carrying a postal box. A short time later, DEAN exited the Post Office and got into his vehicle and left the area. Detective Lundin then went into the Post Office and spoke with the clerk. Detective Lundin asked the clerk about packages heading out of state. The clerk pointed to a small pile of boxes. Detective Lundin noticed a package with the business name of Cellular Solutions located at ███████████████, Hinsdale, NH. This is the residence of DEAN.

36. On March 13, 2020, law enforcement applied for and was granted a search warrant for the mail package DEAN left at the Postal Office. A subsequent search of the package law enforcement located $31,150.00 in United States currency concealed in the package.

37. On March 25, 2020, the UCA contacted DEAN at Target Telephone #1 and made arrangements to purchase one ounce of "Shatter" for $400. DEAN agreed to meet the UCA and subsequently met with the UCA and completed the transaction.

38. Shortly after the UCA and DEAN parted ways, DEAN called the UCA from Target Telephone #1 and asked if the UCA would be interested in the "Breaking Bad" (The UCA understood DEAN to be referring to methamphetamine). DEAN stated that he has a source that is looking to get rid of ten pounds. The UCA stated that they would have to think about it and would need to know the prices. This ended the cellular conversation.

39. A short time later, DEAN sent the UCA a text message from Target Telephone #1 stating that the price would be $1,000.00 for an ounce and $12,000.00 for a pound.

40. Through investigative methods, it was determined that the service provider for Target Telephone #1 is Verizon Wireless. On December 13, 2019, a subpoena was issued to Verizon Wireless for toll and subscriber information for Target Telephone #1. On December 16, 2019 Verizon supplied a response that Target Telephone #1 is assigned to DEAN, account number ▇▇▇74-1, ▇▇▇▇▇▇▇▇▇▇▇▇, Hinsdale, New Hampshire. According to a New Hampshire driver's license check, DEAN resides at ▇▇▇▇▇▇▇▇▇▇ in Hinsdale, New Hampshire.

41. On March 26, 2020, I sent a Preservation Letter to the Verizon Wireless custodian of records requesting that they preserve any existing content, in addition to any content sent or received from that point on, and that I would be applying for a search warrant

11

for further information. Based on that preservation letter, I received a response from Verizon Wireless, indicating that they would preserve content information for a time period of seven days from the receipt of the preservation request.

## BACKGROUND ON CELLULAR SERVICE PROVIDERS

42. Based on my training and experience I have learned that Verizon Wireless is a company that provides cellular telephone access to the general public, and that stored electronic communications, including retrieved voicemail, text, and multimedia messages for Verizon Wireless subscribers may be located on the computers of Verizon Wireless. In addition, I am aware that computers located at Verizon Wireless contain information and other stored electronic communications belonging to unrelated third parties.

43. Wireless phone providers often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail. If the subscriber does not delete the message, the message may remain in the system of Verizon Wireless for weeks or months.

44. Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers. This service is often referred to as Short Message Service ("SMS") or Multimedia Messaging Service ("MMS"), and is often referred to generically as "text messaging" or "wireless messaging." Stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by Verizon Wireless for short periods incident to and following their transmission. In addition, providers

occasionally retain printouts from original storage of text messages for a particular subscriber's account.

45. Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

46. Many wireless providers retain information about the location in which a particular communication was transmitted or received. This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

47. Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different

forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

48. Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates and times of payments and the means and source of payment (including any credit card or bank account number).

49. In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

## **CONCLUSION**

50. This court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(l)(A) and (c)(l)(A). Specifically, the Court is "a district court of the United States . . . that-has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

51. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

AND FURTHER AFFIANT SAITH NOT.

/s/ Benjamin Slocum
Special Agent Benjamin Slocum
Homeland Security Investigations

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: 4/2/2020
Time: _____

/s/ Andrea K. Johnstone
Andrea K. Johnstone
U.S. Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Verizon Wireless cellular phone number ▇▇▇▇8730, in the name of subscriber Ryan DEAN, that is stored at premises owned, maintained, controlled, or operated by Verizon Wireless, a wireless provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey 07921.

## ATTACHMENT B

## Particular Things to be Seized

### I. Information to be disclosed by Verizon Wireless

To the extent that the information described in Attachment A is within the possession, custody, or control of Verizon Wireless, including any messages, records, files, logs, or information that have been deleted but are still available to Verizon Wireless or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Verizon Wireless is required to disclose the following information to the government for each account or identifier listed in Attachment A for the time period **March 18, 2020 through March 26, 2020**:

- a. All voice mail, text, and multimedia messages stored and presently contained in, or on behalf of the account or identifier;

- b. All existing printouts from original storage of all of the text messages described above;

- c. All transactional information of all activity of the telephones and/or voicemail accounts described above, including log files, messaging logs, local and long distance telephone connection records, records of session times and durations, dates and times of connecting, methods of connecting, telephone numbers associated with outgoing and incoming calls, cell towers used, and/or locations used;

- d. All text messaging logs, including date and time of messages, and identification numbers associated with the handsets sending and receiving the message;

- e. All business records and subscriber information, in any form kept, pertaining to the individual accounts and/or identifiers described above, including subscribers' full names, addresses, shipping addresses, date account was opened, length of service, the types of service utilized, ESN (Electronic Serial Number) or other unique identifier for the wireless device associated with the account, Social Security number, date of birth, telephone numbers, and other identifiers associated with the account;

- f. Detailed billing records, showing all billable calls including outgoing digits;

- g. All payment information, including dates and times of payments and means and source of payment (including any credit or bank account number);

 h. Incoming and outgoing telephone numbers;

 i. All records indicating the services available to subscribers of individual accounts and/or identifiers described above; and

 j. All records pertaining to communications between Verizon Wireless and any person regarding the account or identifier, including contacts with support services and records of actions taken.

**II. Information to be seized by the United States**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(l) (distribution of controlled substances); and 846 (conspiracy to distribute controlled substances) and Title 18, United States Code, Section 1956 (money laundering) involving Ryan DEAN from the period of March 18, 2020 through March 26, 2020, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

 a. The acquisition, storage, and distribution of heroin, cocaine, or other controlled substances, the disposition of proceeds of the sales of controlled substances, and the laundering of the drug proceeds.

 b. The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

 c. The identity of the person(s) who communicated with the user ID about matters relating to drug trafficking in furtherance of drug trafficking, including records that help reveal their whereabouts.